IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GEORGE E. HARPER, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>LINDON CITY, a Utah municipal corporation, and HUGH VAN WAGENEN, a Utah resident,<br><br>    Defendants, and<br><br>FAIR CARE LINDON, LLC,<br><br>    Defendant in Intervention. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:18-CV-00772-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiff George E. Harper's Motion for Preliminary Injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. The court held a hearing on the Motion on May 8, 2019. At the hearing, Plaintiff was represented by Edward W. McBride, Jr., Defendants were represented by Robert C. Keller, and the Defendant in Intervention was represented by Daniel J. McDonald. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the Motion. Now being fully advised, the court issues the following Memorandum Decision and Order denying Plaintiff's Motion for Preliminary Injunction.

1

**BACKGROUND**

Plaintiff George E. Harper ("Harper") runs Maple Mountain Recovery, an inpatient treatment center for addiction recovery located in Mapleton City, Utah. In November 2017, Harper purchased the home located at 1422 East 155 South, Lindon, Utah 84042 (the "Property"), where he planned to open another residential inpatient treatment center specifically for women. On or about November 11, 2017, Harper submitted a land use application to Lindon City (the "City") for the new facility under the project name "Lindon RTC." The application, however, did not propose a number of residents. On or about February 22, 2018, Harper submitted another land use application for the Property, but renamed the project "Maple Mountain Recovery – Lindon" ("MMRL"). In his second application, Harper sought a conditional use permit to use the Property "as a residential drug treatment and rehabilitation" program.

In conjunction with the second application, Harper requested both a business license and a reasonable accommodation under the Fair Housing Act ("FHA") in which he asked the City to waive its eight-person limit on the number of unrelated persons that may live together in a "residential facility for persons with a disability" ("RFPD") in the City's R1-12 zone.[1] Specifically, Harper requested a reasonable accommodation to allow MMRL to house up to twenty residents. Harper represented that a conditional use of twenty unrelated persons was preferable because of its "therapeutic value." Further, Harper claimed that the facility conformed to all relevant laws, regulations, and requirements. The application included a site plan and also contemplated a live-in staff, three off-street parking stalls, and family group meetings once a week. Despite these accommodations, Harper claimed that "the usage and

---

[1] The City Code imposes a four-person cap on the number of unrelated individuals that can reside together in a single family dwelling. Yet, the Code provides an exception for RFPDs in which eight unrelated individuals are allowed to live together in the same single family dwelling.

traffic [would] virtually be unchanged." Harper also included a letter from Cliff Simpson ("Simpson"), a clinical director for MMRL, that addressed the number of participants in the program. In the letter, Simpson opined that the optimal size for a therapeutic group was between eight and twelve patients. While he conceded that the request to allow up to twenty residents was above the optimal size, he claimed that there were many instances in which a resident would be unable to attend a group meeting on a given day. Thus, allowing more residents would ensure that the group size never dropped below the ideal number. Simpson also suggested that participants would be entering and exiting the program on an average of every sixty days. Then, in a May 2018 letter, Harper revised the number of requested residents from twenty to sixteen.

On or about May 17, 2018, Harper submitted additional items regarding MMRL to the City, including copies of Maple Mountain Recovery's Policies and Procedures Manual, Employee Handbook, and Resident Handbook. The supplemental materials also included letters from Hanna LeBaron, LCSW ("LeBaron") and Craig Ramsey, LMFT ("Ramsey")—two employees of Harper's organization. In LeBaron's letter, she claimed that it was "vital to have 8-12 women in [a] group meeting at the same time." Further, based on her eighteen-year career of working in the mental health and substance abuse fields, she claimed that centers with less than sixteen residents were less effective. While she claimed that twenty-four clients was the ideal community size, she opined that sixteen was adequate. Beyond these assertions, LeBaron provided no additional support or basis for her conclusions. In Ramsey's letter, he opined that having sixteen beds would allow MMRL "to address the needs of the clients . . . without compromising the integrity or effectiveness of the program." Ramsey claimed that the ideal therapeutic group size was eight to twelve individuals, but could be as high as fifteen. Thus, having sixteen patients would allow MMRL to divide the patients into two groups to "continue

to serve the optimal number of clients effectively." Like LeBaron, Ramsey did not cite any articles or statistics to support his claims.

In response to Harper's request for a reasonable accommodation under the FHA, a group of city residents who own homes and live near the Property (Intervenor Defendant Fair Care Lindon, LLC ("Fair Care")) submitted a thirty-eight page opposition, which contained, among other things, a detailed affidavit from Dr. John Majer ("Dr. Majer"), an expert on addiction and recovery in residential settings. In his affidavit, Dr. Majer questioned whether MMRL's proposed number of patients was therapeutically necessary. In addition to its objection to Harper's request for a reasonable accommodation, Fair Care submitted another objection to MMRL qualifying for the eight-bed RFPD exception.

In August 2018, the City held a hearing (the "Hearing") to consider Harper's request for a reasonable accommodation in allowing sixteen unrelated individuals to reside at the Property. On August 29, 2018, Hugh Van Wagenen ("Van Wagenen"), the City Planning Director, denied Harper's request.[2] Van Wagenen concluded that Harper failed to (1) provide sufficient evidence to explain why the request was necessary or reasonable and pointed out that Harper's evidence included statements acknowledging that eight individuals would be adequate to meet the therapeutic needs of patients; (2) produce evidence to support his claim that the proposed use would not affect or change the character of the neighborhood; and (3) submit evidence that the requested accommodation would achieve equal results for housing opportunities between people with and without disabilities. Lastly, the City noted that Harper also asked for a waiver from compliance with the City's code requirement that the Property be made handicap accessible

---

[2] In a separate decision, the City also determined that MMRL did not qualify as an RFPD under City Code §§ 17.70.020 and 17.70.030.

4

pursuant to the Americans with Disabilities Act ("ADA").  But Harper failed to provide any evidence or arguments supporting his request to be exempted from this requirement.

Despite the City providing Harper with the necessary information to appeal the City's decision, Harper filed the instant suit on October 2, 2018.  The next day, on October 3, Harper filed a motion for preliminary injunction.  On November 21, 2018, Fair Care filed a motion to intervene, which the court granted a few weeks later.  On November 25, 2018, Harper withdrew the motion for preliminary injunction, but two days later, on November 27, he filed a second motion for preliminary injunction.  Then, on December 16, 2018, Harper filed an amended complaint in which he added Van Wagenen as a defendant.  In the Amended Complaint, Harper raised five causes of action alleging violations of the FHA and 42 U.S.C. § 1983.[3]  For the § 1983 causes of action, Harper claimed violations of free speech, equal protection under the Fourteenth Amendment, and due process under the Fifth and Fourteenth Amendments.  He also raised municipal liability for having an illegal policy or custom.  On January 30, 2019, the court entered an order denying Harper's second motion for preliminary injunction without prejudice because that motion was filed in relation to Harper's inoperative original complaint.  Harper then filed a third motion for preliminary injunction (the Motion now before the court) on February 28, 2019 in which he seeks to enjoin specific provisions of the City Code.

**DISCUSSION**

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  The right to injunctive relief "must be clear

---

[3] The Amended Complaint does not have a "COUNT IV."  Thus, while the final cause of action is listed as "COUNT VI," there are only five causes of action (COUNTS I-III and V-VI).

and unequivocal." *Id.* (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004)). Moreover, to obtain a preliminary injunction, the movant must establish the following four factors:

> (1) the movant is substantially likely to succeed on the merits; (2) [the movant] will suffer irreparable injury if the injunction is denied; (3) [the movant's] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (alterations in original).[4] Nevertheless, when a movant seeks "(1) [a] preliminary injunction[] that alter[s] the status quo; (2) [a] mandatory preliminary injunction[]; [or] (3) [a] preliminary injunction[] that afford[s] the movant all the relief that it could recover at the conclusion of a full trial on the merits," the movant must satisfy a heightened standard. *Id.* at 723–24. In such cases, the movant must "make[ ] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 724 (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)). Defendants claim that the heightened standard applies in this case. The court need not address that issue, however, as Harper's Motion fails to satisfy the basic standard for a preliminary injunction.

### A. Likelihood of Success on the Merits

In his Motion, Harper contends that he is likely to succeed on his claims that (1) the City Code facially discriminates against the disabled in violation of the FHA; (2) the City applied the incorrect standard of review to his request for a reasonable accommodation; (3) the City Code

---

[4] In his Motion, Harper argues that if the latter three factors are satisfied, the first factor too is satisfied if the plaintiff simply raises "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981). Since the Supreme Court's decision in *Winter*, however, modified tests that relax any of the four factors are no longer permissible. *See New Mexico*, 854 F.3d at 1246. Accordingly, the court rejects Harper's relaxed-standard argument.

6

violates the United States Constitution; and (4) the City Code creates circularity in its licensing requirements. The court will address each of these claims in turn.

### 1. Facial Challenge

Under the FHA, it is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). The FHA defines "handicap" to include individuals that have a "mental impairment which substantially limits one or more" of their major life activities. *Id.* § 3602(h)(1). "It is well established that individuals recovering from drug or alcohol addiction are handicapped under the [FHA]." *Corp. of Episcopal Church in Utah v. W. Valley City*, 119 F. Supp. 2d 1215, 1219 (D. Utah 2000). To challenge a law or policy as being discriminatory against the disabled under the FHA, plaintiffs frequently rely on a disparate treatment theory of liability. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995). A disparate treatment claim arises when a policy or ordinance is discriminatory on its face. *See id.* at 1500–01. In other words, ordinances that "single out the handicapped and apply different rules to them" are facially discriminatory. *Id.* at 1500.

To ascertain whether an ordinance singles out the handicapped, courts consider its application by comparison to the non-handicapped. *See id.* at 1502. Under this comparative analysis, and in the context of group living arrangements ("GLAs"), plaintiffs must show that their GLA for the handicapped was subjected to conditions not imposed on GLAs for the non-handicapped. *Id.* If plaintiffs fail to make such a showing, they have failed to demonstrate that they have "suffered differential treatment when compared to a similarly situated group," and their FHA claim will not succeed. *Id.*; *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 920 (10th Cir. 2012).

In the event an ordinance proves to be facially discriminatory, however, it is not illegal per se, and must be analyzed in light of any proposed justifications for the differential treatment. *Bangerter*, 46 F.3d at 1500–03. The FHA contemplates at least two justifications that allow forms of intentional discrimination toward the handicapped. *Id.* at 1503. First, the Act permits "reasonable restrictions on the terms or conditions of housing when justified by public safety concerns, given that housing can be denied altogether for those same reasons." *Id.* Second, the Act "should not be interpreted to preclude special restrictions upon the disabled that are really beneficial to, rather than discriminatory against, the handicapped." *Id.* Nevertheless, such exceptions to the FHA's "prohibitions on discrimination should be narrowly construed." *Id.*

In this case, Harper claims that City Code §§ 5.42.030, 050, 130, 17.70.030, and 060 violate the FHA because they "facially discriminate against a federally protected class by . . . establishing a maximum number of 8 non-related occupants in any residential recovery home." §§ 5.42.030 and 050 both deal with the licensing requirements necessary to establish and maintain an RFPD within the City limits. §§ 5.42.130 and 17.70.060 delineate the steps to obtain a reasonable accommodation from the City Code based on the FHA. Lastly, § 17.70.030 establishes the specific requirements for RFPDs and provides that "[n]o residential care facility shall exceed eight (8) residents, excluding live-in staff." City Code § 17.70.030(7). In support of his claim, Harper relies almost exclusively on a joint statement issued in November 2016 by the Department of Housing and Urban Development and the Department of Justice ("Joint Statement"). Specifically, Harper relies on the following language: "Local governments should be aware that ordinances and policies that impose additional restrictions on housing or residential services for persons with disabilities that are not imposed on housing or residential services for persons without disabilities are likely to violate the Act." U.S. Dep't of Housing & Urban Dev.

and U.S. Dep't of Justice, Joint Statement on State and Local Land Use Laws and Practices and the Application of the Fair Housing Act (Nov. 10, 2016) at 11–12 [hereinafter Joint Statement]. The court concludes, however, that Harper's reliance on the Joint Statement is misplaced for two reasons. First, as an informal agency statement, it does not carry the "force of law," *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000), and thereby does not serve the same precedential value as the binding FHA case law that exists in this Circuit. Second, even though the Joint Statement may be an accurate representation of the law, Harper fails to qualify it by taking into account the justifications outlined in *Bangerter*. As such, the Joint Statement will not carry the day for Harper's claims.

Instead, for Harper to be successful in challenging the City Code, he must provide evidence, pursuant to *Bangerter* and *Cinnamon Hills*, showing that other non-handicapped groups in the City were not required to abide by the City Code in the same manner required of MMRL. Harper has failed to make such a showing.

First, all businesses operating within the City limits are required to obtain a license to operate. City Code § 5.04.050. Harper has produced no evidence of any similarly situated non-handicapped groups who have been exempted from that requirement. In fact, the City recently renewed business license applications for two residential treatment centers located within the City limits. *See* Def.'s Opp'n to Pl.'s Mot. Ex. K [Docket No. 40-11], at ii. Further, Harper has failed to provide any evidence that the City or the City Code treated any other similarly situated non-handicapped groups differently than MMRL. Accordingly, Harper has failed to demonstrate that MMRL has suffered differential treatment.

Even though Harper has failed to provide evidence that MMRL has suffered differential treatment, the eight-person cap clearly treats the handicapped differently. However, that

9

differential treatment is not unlawful based on the second *Bangerter* justification. As a preliminary matter, the City Code defines a "family" as being limited to a group of "not more than four (4) non-related persons in a single dwelling unit." City Code § 17.02.010. Thus, regardless of disability or handicap, the City Code imposes a four-person cap on all GLAs. Nevertheless, §§ 5.42.020 and 17.70.020 provide an exception to the four-person cap for RFPDs. Specifically, those sections define an RFPD to mean a "residential facility in which *more than four* (4), but no more than eight (8), unrelated individuals, exclusive of staff, who have a disability reside." City Code §§ 5.42.020 and 17.70.020 (emphasis added); *see also* § 17.70.030(7). While it is clear that those sections treat the handicapped differently, the differential treatment is actually "beneficial to, rather than discriminatory against, the handicapped." *Bangerter*, 46 F.3d at 1503. Indeed, under the eight-person RFPD exception, the handicapped have preferential housing opportunities because, unlike other GLAs, they are permitted an eight-person cap instead of the general four-person cap.[5] As such, the eight-person cap on RFPDs falls within the purview of the second *Bangerter* justification.

Harper has failed to demonstrate that the City Code facially discriminates against MMRL without justification. Accordingly, Harper has not shown a substantial likelihood of success on his facial discrimination claim.

### 2. Reasonable Accommodation Claim

The FHA defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be

---

[5] The Eighth Circuit has previously resolved a case with issues similar to the case at bar. *Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996). In *Oxford House*, the city code at issue allowed only three unrelated and non-handicapped individuals to live together in a single family zone. *Id.* at 252. The city code, however, allowed up to eight unrelated and handicapped individuals to live together in a single family dwelling. *Id.* at 251. The plaintiff challenged the eight-person accommodation under the FHA. *Id.* at 251–52. The Eighth Circuit rejected the plaintiff's challenge and held that "[r]ather than discriminating against Oxford House residents, the City's zoning code favors them on its face. The zoning code allows only three unrelated, nonhandicapped people to reside together in a single family zone, but allows group homes to have up to eight handicapped residents." *Id.*

necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling."[6] 42 § U.S.C. 3604(f)(3)(B). "Put simply, the statute requires accommodations that are necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without." *See Cinnamon Hills*, 685 F.3d at 923. "But while the FHA requires accommodations necessary to ensure the disabled receive the *same* housing opportunities as everybody else, it does not require *more* or *better* opportunities." *Id.* (emphasis in original). Indeed, the very "point of the reasonable accommodation mandate" is "to require changes in otherwise neutral policies that preclude the disabled from obtaining 'the *same* . . . opportunities* that those without disabilities automatically enjoy.'" *Id.* (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98 (2002)). Therefore, "when there is no comparable housing opportunity for non-disabled people, the failure to create an opportunity for disabled people cannot be called necessary to achieve equality of opportunity in any sense." *Id.*

Harper claims that the City applied the incorrect standard of review to his request for a reasonable accommodation to allow MMRL a capacity of sixteen residents.[7] Again, Harper relies almost exclusively on the Joint Statement. In this regard, the Joint Statement provides:

> A state or local government violates the Fair Housing Act by failing to grant a reasonable accommodation request if . . . the state or local government cannot show that granting the accommodation would impose an undue financial and administrative burden on the local government or that it would fundamentally alter the local government's zoning scheme.

Joint Statement at 15. Still, the court maintains the same reservations mentioned above, and likewise concludes that the Joint Statement will not render Harper's reasonable accommodation claim successful.

---

[6] It is noteworthy that unlike facial discrimination as discussed above, discrimination claims based on a request for reasonable accommodation "do[] not require proof of differential treatment." *Bangerter*, 46 F.3d at 1502 n.18.
[7] In his Motion, Harper makes passing references to the City Code being discriminatory *as applied* to MMRL. Yet, Harper does not provide any analysis on this point. Nevertheless, the court will construe his Motion as challenging the City's reasonable accommodation decision and statute as applied to MMRL.

Rather, under the framework established in *Cinnamon Hills*, Harper has failed to demonstrate a substantial likelihood of success on his reasonable accommodation claim. First, no GLAs are allowed in the City's R1-12 zone—whether disabled or not. Thus, because "there is no comparable housing opportunity for non-disabled people" in the R1-12 zone, a reasonable accommodation was not necessary "to achieve equality of opportunity in any sense." *Cinnamon Hills*, 685 F.3d at 923. Furthermore, Harper had the burden of proving that his request was necessary, which he failed to do. *See Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001) (explaining that a city "cannot be liable for refusing to grant a reasonable and necessary accommodation if the [c]ity never knew the accommodation was in fact necessary"). Likewise, Harper failed to meet his burden of proving that his request was reasonable. *See id.* Harper's failure to satisfy these burdens flows from three flaws in his application. First, each of the three letters that Harper provided to the City in support of his request indicated that having a capacity of eight residents was sufficient to meet the therapeutic needs of those residents.[8] *See Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 461 (3d Cir. 2002) (holding that the FHA "requires [a requestor for a reasonable accommodation] to show that the size of its proposed Facility is required to make it . . . medically effective"). Second, Harper provided no evidence that MMRL would not change or affect the character of the surrounding neighborhood. To the contrary, Fair Care provided emails and photographs of MMRL and Harper's Mapleton City facility that indicated there were parking issues at those facilities. *See Keys Youth*, 248 F.3d at 1275 ("[W]hen a defendant possesses a legitimate nondiscriminatory reason for a housing decision, a plaintiff's requested

---

[8] Dr. Majer also called into question Harper's argument that more than eight residents was necessary to meet patients' therapeutic needs. While the court does not base its decision on Dr. Majer's reasoning, his reservations lend support to the court's finding that Harper failed to produce evidence that his requested accommodation was both reasonable and necessary.

12

accommodation must substantially negate the defendant's concern in order to be considered reasonable."); *see also Bryant Woods Inn, Inc. v. Howard Cty.*, Md., 124 F.3d 597, 604 (4th Cir. 1997) (affirming the district court's denial of a request for reasonable accommodation to expand a group home from eight to fifteen residents due, in part, to potential parking congestion). Third, Harper failed to submit evidence that his request was economically necessary. *Keys Youth*, 248 F.3d at 1275. Indeed, based on Harper's affidavit that he submitted with his Motion, MMRL would be able to function at a substantial profit with no more than eight residents at a time.[9] Thus, Harper has failed to produce evidence that his request was both reasonable and necessary.

Harper had the burden of proving that his request for a reasonable accommodation was necessary and reasonable. Harper failed to meet that burden. Accordingly, Harper has failed to show a substantial likelihood of success on his reasonable accommodation claim.[10]

### 3. Constitutional Contentions

Harper contends that the City Code violates the Constitution. Specifically, Harper claims violations of the rights associated with due process, equal protection, and intimate association. However, Harper failed to specifically address how the City Code violates the Constitution. Moreover, city ordinances that place limitations on the number of unrelated individuals that can live together in a single family dwelling are not unconstitutional. *Vill. of Belle Terre v. Boraas*,

---

[9] At the hearing, Harper testified and disputed the amount of monthly expenses listed in his affidavit. He testified that his expenses exceeded that amount. Either way, Harper still failed to establish the economic necessity of his request.

[10] In its denial of Harper's request for a reasonable accommodation, the City mentioned that Harper had also requested an exemption from ADA requirements. The City noted that Harper failed to present any evidence why MMRL should not be required to abide by the ADA's handicap accessibility requirements. At the hearing, Harper testified that other residential treatment facilities in the state, but outside of the City limits, are not required to be ADA compliant. However, this issue was not adequately considered in the briefs by any of the parties. Consequently, the court will not address the issue. *See Cinnamon Hills*, 685 F.3d at 924 n.4 ("[I]n briefing the reasonable accommodation inquiry, the parties have relied only upon case law interpreting the FHA alone. If the . . . ADA embrace[s] a different standard than the FHA, no one has suggested it to us. As a result, we decline to address the issue.").

416 U.S. 1, 7–9 (1974). Therefore, Harper has failed to demonstrate a likelihood of success on his constitutional claims.

### 4. Licensing Circularity

In his Motion, Harper asserts that the City Code creates circularity in the procedure to obtain the proper licenses for an RFPD. However, Harper failed to adequately brief that issue, and the court is unable to discern what arguments, if any, Harper raises in support of that claim. In any event, the fact that two other RFPDs are already functioning within the City limits under the City's current licensing scheme cuts against Harper's circularity argument. As such, Harper has not demonstrated a likelihood of success on his circularity argument.

Because Harper has failed to show a substantial likelihood of success on the merits of any of his claims, the court denies his Motion for Preliminary Injunction.

## B. Irreparable Harm

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *New Mexico*, 854 F.3d at 1249. "To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Fish*, 840 F.3d at 751 (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)). Furthermore, the "harm 'must be both certain and great,' and not 'merely serious or substantial.'" *New Mexico*, 854 F.3d at 1250 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). "Purely speculative harm will not suffice." *RoDa Drilling*, 552 F.3d at 1210.

In this case, Harper claims that the City's actions are currently and will continue injuring both him and prospective recovery residents. He claims that such residents will be deprived of housing in violation of their constitutional rights. Harper's claims, however, fail for two reasons.

First, as it relates to future MMRL residents, the harm is purely speculative. Indeed, the injuries as alleged in Harper's Motion are neither concrete nor specific, and he has not shown that the City's denial of his request has actually deprived a potential resident of housing opportunities. Second, at the hearing, Harper conceded that his alleged harm could be remedied after the fact entirely by money damages. Accordingly, Harper has failed to establish that he has suffered or will suffer irreparable harm in the absence of an injunction. Thus, on this independent basis alone, the court denies Harper's Motion for Preliminary Injunction.

### C. Balance of Injuries

Because preliminary injunctions are extraordinary remedies, they are "never awarded as of right." *Winter*, 555 U.S. at 24. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (internal quotation marks omitted). In doing so, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Harper claims that his "injury and lack of housing outweighs any potential injury to the Defendant[s], and irreparably harms [him] and many residents, by denying housing accommodations." He contends that "[p]otentially few, if any, disgruntled constituents do not constitute an injury to the Defendants." On the other hand, the City contends that the public has an interest in ensuring that ordinances "continue to provide stability and a framework for balancing safety considerations, fair access to housing, and zoning expectations." If the court were to grant Harper's Motion, it would "upset this balance and undermine the City's traditional responsibility to regulate local zoning."

If the court granted Harper's Motion, then Harper would be able to have as many residents at MMRL as he desires, and there would no longer exist requirements regarding the

15

maintenance and operation of an RFPD. This, of course, would also benefit Harper economically. It would undermine the City's zoning authority, however, and would create uncertainty and confusion surrounding RFPDs as they would become mostly unregulated. Conversely, if the court denied Harper's Motion, he would have to follow the existing procedure in opening MMRL, including the eight-person cap. While this would be the less economically beneficial option for Harper, as discussed above, he would still be able to run MMRL at a significant profit. In addition, the City would be able to maintain its existing RFPD framework and balance "safety considerations, fair access to housing, and zoning expectations."

Bearing in mind these considerations, the court concludes that Harper's threatened harm does not outweigh that of the City. The possible public consequences resulting from such an injunction outweigh the almost purely economic harm suffered by Harper. Moreover, "[l]and use planning and the adoption of land use restrictions constitute some of the most important functions performed by local government." *Bryant Woods*, 124 F.3d at 603. Accordingly, Harper has failed to establish the third factor for a preliminary injunction. Consequently, the court denies Harper's Motion.

### D. The Public Interest

"A movant . . . has the burden of demonstrating that the injunction, if issued, is not adverse to the public interest." *Fish*, 840 F.3d at 755 (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003)). On this factor, Harper's argument consists of one sentence: "Compliance with the Fair Housing Act is [in] the public's interest." While that is an accurate statement, "it was not the intent of Congress to gut local government power and functions when it enacted the FHA," and "courts have been reluctant to ride roughshod over local zoning codes." *Recovery Landholdings, LLC v. City of S. Ogden*, No. 1:17-CV-152 TS,

2019 WL 1489003, at *5 (D. Utah Apr. 4, 2019). Indeed, Harper failed to consider the public's legitimate and compelling interest in the consistent enforcement of legislatively enacted ordinances. Furthermore, Harper's argument presupposes that the City Code violates the FHA and treats the disabled differently and negatively. Yet, as discussed above, the City Code provisions at issue in this case seem "beneficial to, rather than discriminatory against, the handicapped." *Bangerter*, 46 F.3d at 1503. Therefore, Harper has failed to meet his burden for the public interest factor. As a result, Harper's Motion for Preliminary Injunction is denied.

## CONCLUSION

Based on the foregoing reasoning, Plaintiff's Motion for Preliminary Injunction [Docket No. 35] is hereby DENIED.

DATED this 21st day of May, 2019.

BY THE COURT:

*Dale A. Kimball*

DALE A. KIMBALL
United States District Judge